**MICHIGAN GLASS AND GLAZING**
**INDUSTRY DEFINED CONTRIBUTION**
**PENSION PLAN, et al.,**

               **Plaintiff(s),**       **CASE NUMBER:  06-12917**
                                       **HONORABLE VICTORIA A. ROBERTS**

**v.**

**CAM GLASS, INC. a/k/a CAM GLASS**
**INCORPORATED, et al.,**

               **Defendant(s).**
_____/

**ORDER**

## I.      INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Summary Judgment.  For the reasons stated below, Plaintiffs' motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.     BACKGROUND

Plaintiffs Michigan Glass and Glazing Industry Defined Contribution Pension Plan and Michigan Glass & Glazing Industry Welfare Insurance Fund (collectively "Michigan Glass" or "Plaintiffs") are trust funds established and administered under Section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §186, *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.*  Their complaint stems from fringe benefit contributions they contend are owed under the

1

terms of a collective bargaining agreement ("CBA").

During the relevant time, Defendant Charles Walker owned two Michigan corporations through which he ran crews of window installers as a subcontractor on projects at schools and similar facilities in several counties throughout Michigan-- Defendant CAM & Company, Inc. ("CAM & Company") and Defendant CAM Glass, Inc. a/k/a CAM Glass Incorporated ("CAM Glass"). Walker formed CAM & Company in 1999 and CAM Glass in 2001. He is the owner and President of both companies, and the registered address of both is Walker's home address. Per Defendants, CAM & Company has no employees, and it bids on construction related jobs and window installation for small commercial projects. Walker says CAM & Company only bids or seeks projects that do not involve union labor or pay union scale. CAM Glass ceased its operations in 2005 and dissolved in 2006. Prior to its cessation, CAM Glass also operated as a subcontractor, but only on window installation projects which required union labor.

Defendants say CAM & Company's relationship with general contractor Huron Valley Glass ("HVG") began when CAM & Company successfully completed a contract that HVG's "in house" crew was unable to timely complete. Thereafter, CAM & Company bid on other HVG contracts which did not involve union labor. But, in 2001 Walker says HVG became interested in bidding on contracts in the Detroit area which required union labor and invited him to bid on the subcontracts. Presumably, the union labor restriction arose when HVG entered into a CBA with Glaziers, Architectural Metal and Glassworkers Local Union No. 357 ("Local 357"), which requires HVG to only subcontract window installation and any other covered work to companies that are also

2

bound by the Local 357 agreement. Walker says he formed CAM Glass on June 20, 2001 and entered into a CBA with Local 357 for the sole purpose of bidding on HVG's Detroit-area subcontracts. Walker signed the CBA on CAM Glass' behalf as President. At the time, Local 357 was unaware of CAM & Company or Walker's affiliation with it.

CAM Glass' 2001 contract with Local 357 was effective through May 2004. In April 2005, Walker signed a second CBA with Local 357 on behalf of CAM Glass, effective through May 2007. Both agreements covered window installation and related work performed in Southeastern Michigan. The 2001 agreement specifically covered work "north of Route 50 including any projects built within the city limits of Monroe in Monroe County, Sanilac, St. Clair, Macomb, Oakland, Wayne, Washtenaw and the eastern half of Livingston County including the city of Howell and the northeast portion of Lenawee County." Aff. of Michael Clem, Exh. A at Art. 1, Sec. 1.1. The 2005 agreement covered "Sanilac, St. Clair, Macomb, Oakland, Wayne, Washtenaw, Monroe, Lenawee and the eastern half of Livingston County including the city of Howell." Aff. of Michael Clem, Exh. B at Art. 1, Sec. 1.1.

Plaintiffs say Walker only executed the 2005 CBA after Michael Clem, the Local 357 business manager, saw and reported that Walker was working for HVG at Sashabaw Middle School in Clarkston, Michigan (in April 2005) without employing members of Local 357. Defendants say the Sashabaw job was originally subcontracted to CAM & Company by HVG under a "prevailing wage contract," which only requires subcontractors to pay the prevailing wage in the area. But, HVG reserved the right to change the contract from prevailing wage to one which required union labor and, after the job was underway, Defendants say HVG indicated that union labor had to be

involved. So, per Defendants, the CAM & Company contract was dissolved and a new contract was drawn with CAM Glass. CAM Glass subsequently hired Local 357 member Robert Wilson to work at Sashabaw. But, Wilson's paychecks did not include statements showing the date of payment, the pay period, or the hours worked in the pay period as required by the CBA. Defendants, however, point out that the fund contribution report shows that hours were reported and benefits were paid for Wilson and another Local 357 member who worked on the project, Mark Chivington. Aff. of Michael Clem, Exh. 4.

In June 2005, a third-party audited the payroll of CAM Glass on Plaintiffs' behalf. Plaintiffs say they were still unaware of CAM & Company when the audit of CAM Glass was performed. Auditor Kem Whatley says Walker provided "Quick Book" records for CAM Glass for Chivington, Wilson, two installers who worked on the Sashabaw project (Richard Gierucki and Allen Steele), and a fourth installer who worked on other projects (Oneil Perrier). Whatley says Walker did not provide tax records for work performed by these individuals between 2002 and 2004, except for a 1099 Form for Perrier for 2004. Whatley determined that CAM Glass owed an indebtedness for the period October 2002 through June 2005 of $3,887.46, which includes $3,038.10 in delinquent contributions, $408.36 in audit assessments (liquidated damages), and $441.00 in audit costs.

Defendants dispute the validity of the auditor's findings. They say the auditor only requested information from November 2004 through April 2005, and the audit only pertained to workers (Gierucki, Steele, and Perrier) who were members of the Laborers Union, not Local 357. Defendants say the benefits for those workers were paid to the Laborers Union. Defendants also say the benefits Plaintiffs attempt to recoup for

Perrier's work are for a project in Jackson County, which is outside the geographic area covered by the CBA.

Under the terms of the CBA, disputes between Local 357 and CAM Glass "involving the interpretation or application of the terms and provisions of [the CBA] which cannot be settled by the parties involved" must be heard by the "Trade Board" (which the parties refer to as the "Joint Trade Board" or "the Board"). Aff. of Michael Clem, Exh. A, Art. 17, Sec. 17.2. The Board consists of an equal number of representatives for CAM Glass and Local 357. *Id* at Art. 17, Sec. 17.1. If the Board reaches a majority decision, the CBA provides that it is "final and binding" on Local 357 and CAM Glass. *Id* at Art. 17, Sec. 17.2. Disputes may only be alternately resolved by arbitration if the Board refuses to hear the dispute or fails to reach a majority decision. *Id* at Art. 17, Sec. 17.2-17.3.

In December 2005, Local 357 filed a grievance with the Joint Trade Board against CAM Glass. In the grievance, Local 357 charged CAM Glass with failure to pay fringe benefit contributions as set forth in the audit, and failure to issue proper payroll check stubs (to Wilson). A hearing was held on January 9, 2006. Notice of the hearing and a copy of the grievance was sent to Walker's home address, purportedly by certified mail. But, neither Walker nor any other representative of CAM Glass appeared for the hearing.

On January 10, 2006, the Board issued a written opinion in favor of Local 357. It found that CAM Glass failed to issue proper pay stubs to Wilson on five occasions and failed to make contributions to the various funds between October 2002 and June 2005 as alleged by the auditor. The Board recommended that CAM Glass pay the funds all

outstanding amounts, including interest and collection charges. Walker says he did not receive the grievance, notice of hearing, or Board decision and was unaware of any of it until after this lawsuit was filed, because he was in Charlevoix, Michigan on a job for most of the month of December 2005 through February 2006.

Plaintiffs' initial brief indicated they were only attempting to recover $2,632.86 of the amount deemed outstanding by the auditor because one of the funds included in the audit is not a party Plaintiff--the International Pension Fund. In their Reply, however, Plaintiffs lowered that figure to $1,992.20. Pl. Reply at p.8. (Plaintiffs do not explain the reduced figure, but it appears they omitted the $1,045.50 owed to the Glaziers Pension Fund, which is not a party to this action.)

Plaintiffs contend that it is owed additional contributions for work CAM & Company performed for HVG between 2004 and 2007 without paying fringe benefit contributions. In support, Plaintiffs provide invoices and a subcontract which show that CAM & Company performed window installation work for HVG between March 2004 and July 2006 in Oakland, Wayne, Washtenaw, and Jackson counties. Clem also says he saw Walker and a crew in June 2007 at a job site for Traverse City Glass and Plymouth-Canton Schools. Defendants maintain that any work in Jackson County was outside the scope of the CBA, and Walker says CAM & Company was paid for his work on quality control at the Plymouth-Canton Schools but did not subcontract any labor for that job.

CAM Glass' audit documents and CAM & Company tax (1099) records show that at least three individuals (Chivington, Steele and Gierucki) worked for both companies in 2005. Aff. of Kem Whatley, Exh. A; Second Aff. of Kem Whatley, Exhs. A-B; Pl. Exh.

6

7.  But, Defendants say Chivington is the only Local 357 member to work for CAM & Company, and they point out that Clem admits that Chivington was suspended from the union in July 2005 for non-payment of dues, and he was dropped from membership in April 2006.  Aff. of Michael Clem at ¶21.  Additionally, Defendants say Chivington, Steele and Gierucki (and a fourth individual for whom tax records were provided, Joseph Button), whom they refer to as "subcontractors," each owned their own carpentry businesses and had business contracts with CAM & Company.  Def. br. at p.13, ¶23; Def. Exh. 1 at ¶¶12, 24.  Walker says no subcontractors worked for CAM & Company in 2006 within the geographic area covered by the CBA.  Def. Exh. 1 at ¶27.

Chivington, Gierucki and Steele signed affidavits which support Defendants' claims.  Gierucki and Steele say they: 1) were never members of Local 357, 2) were briefly members of the Laborers Union, 3) only performed work for CAM & Company as subcontractors (via their respective companies), and 4) did not work in the CBA's geographic area in 2006.  Def. Exhs. 3, 5.  Chivington makes the same affirmations, except he acknowledges that he was briefly a member of Local 357; he dropped out of the union after the Sashabaw job was complete.  Def. Exh. 4.

Plaintiffs contend Walker paid installers who performed work for CAM & Company as if they were independent contractors in order to circumvent the union contract.  They further contend that CAM Glass and CAM & Company were essentially the same company.  In support, they point out that both companies:  1) list Walker's wife, Amy, as the secretary and office manager, 2) share the same address, and 3) utilize the same employees.  Also, in April and May 2005, CAM & Company twice transferred money into CAM Glass' bank account in order to fund payroll on the

Sashabaw job.  And, when CAM Glass closed its account, the balance was transferred into CAM & Company's account.

Defendants admit that both businesses operated out of Walker's home and shop. But, they say each business has its own records and bank accounts and operated as separate businesses.  With respect to the transfer of funds between the companies, Defendants say CAM & Company funds were transferred to CAM Glass after the Sashabaw contract was transferred to CAM Glass in order to finish the contract.  And, Defendants say that after CAM Glass dissolved, the balance in the CAM Glass account ($3,385.00) was transferred to CAM & Company as a "capital investment."

Plaintiffs assert that Walker invoiced more than $375,000 of work to HVG through both of his companies between October 2002 and December 2005.  Per Plaintiffs, CAM & Company paid its installers approximately $130,000 from May 2004 through 2005, and approximately $55,000 between January 1, 2006 and January 11, 2007.  Whatley reviewed payments by CAM & Company to the four companies owned by Chivington, Steele, Gierucki, and Button between May 2004 and January 2007.  She then sorted those payments by month and divided the amounts by union scale, which resulted in an estimated number of hours worked.  *See* Whatley Second Aff. at ¶2. Based on her analysis of CAM & Company's payments, Whatley concluded that $90,859.86 in contributions are owed under the CBA for income it paid to Chivington, Steele, Gierucki, and Button between May 2004 and January 2007.  *Id* at Exh. A.  Of that amount, Whatley says $53,000 was incurred between May 2004 and June 2005.  *Id* at ¶3.

Walker disputes Whatley's calculations on several grounds.  First, he says one of

8

the companies to which Whatley refers, Lakeview Construction, did not perform any work within the geographic area of the CBA; it only worked in Jackson County. Def. Exh. 2 at ¶2. Second, he says Whatley's calculations include money due to a fund which is not a party to this litigation, the Glaziers Pension Fund. *Id* at ¶3. And, he says that, between May 2004 and January 2007, CAM & Company paid a maximum of 1572 hours to subcontractors within the Local 357 area, which would only result in an indebtedness of $11,604 for contributions (when the Glaziers Pension Fund contributions are excluded). *Id* at ¶5. Between May 2004 and June 2005, Walker says CAM & Company paid a maximum of 1399 hours to subcontractors within the Local 357 area, which would only result in an indebtedness of $10,324 for contributions (without Glaziers Pension Fund contributions). *Id* at ¶6.

In an Amended Complaint, Plaintiffs assert in Count I that CAM Glass and CAM & Company operated either as a single employer, a double breasted operation, or alter egos and, therefore, are jointly liable for unpaid fringe benefits owed for work performed for either company. In Count II, Plaintiffs seek to enforce the Board decision which covers the period from October 2002 through June 2005. In Count III, they allege that Defendants are liable for delinquent contributions and liquidated damages.

In their Motion for Summary Judgment, Plaintiffs ask that the Court: 1) find that CAM Glass is bound by the CBA and is obligated to pay fringe benefit contributions to Plaintiffs; 2) confirm the Board award; 3) find that CAM & Company is an alter ego of CAM Glass and, therefore, is obligated to pay fringe benefit contributions to Plaintiffs; 4) finds that CAM Glass and CAM & Company are jointly liable for all unpaid contributions owed to Plaintiffs; 5) find that Walker is personally liable for the indebtedness of CAM

Glass and CAM & Company because of his misuse of the corporate form; and 6) award Plaintiffs all unpaid contributions owed under the CBA by CAM Glass and CAM & Company, plus interest, liquidated damages, attorneys' fees and costs, and audit costs.

## C.  STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*,

48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## D.   APPLICABLE LAW AND ANALYSIS

### A.   Defendants Waived Objections to Award in Favor of CAM Glass

Pursuant to Section 301 of the LMRA, 29 U.S.C. §185, Plaintiffs ask the Court in Count II to confirm the Joint Trade Board's decision in favor of CAM Glass.

It is settled that "final and binding decisions made by joint employer-union grievance panels . . . must be enforced under §301 of the Labor Management Relations Act of 1947" and "are entitled to the same deference as that given to the decision of an arbitrator under national labor law." *Teamsters Freight Employees Local Union No. 480 v Bowling Green Express, Inc.*, 707 F.2d 254, 256 (6th Cir. 1983).

Defendants contend that Plaintiffs' request for confirmation of the Board's decision should be denied on procedural and substantive grounds. Procedurally, Walker says CAM Glass was not afforded due process because he was not served with

the grievance, notice of the hearing, and decision (on CAM Glass' behalf) and he was unaware of any of the proceedings or the decision until after this action was filed in September 2006. Walker says he did not receive the Board's decision until November 2, 2006, after Plaintiffs provided it to defense counsel. Substantively, Defendants dispute the amount the auditor found is owed to Local 357 for work performed between October 2002 and June 2005. Specifically, Defendants contend that fringe benefit payments were not owed for some of the individuals included in the auditor's calculation because they were not members of Local 357 and/or performed worked outside the geographical area of the contract.

Defendants' arguments fail on two grounds: 1) they are untimely, and 2) the Court is prohibited from weighing the merits of the Joint Trade Board decision.

First, CAM Glass waived its objections to the award by failing to timely file a motion to vacate it. Decisions which derive from employer-union grievance panels are subject to the same statute of limitations for actions to vacate an arbitration award-- three months. *See Occidental Chemical Corp. v International Chemical Workers Union*, 853 F.2d 1310, 1316 (6th Cir. 1988); *Laborers' Pension Trust Fund-Detroit and Vicinity v Lange*, 2006 W.L. 891167, *6 (E.D. Mich. 2006); *Local 67 v Emerson*, 2006 W.L. 2521422, *2 (E.D. Mich. 2006). Defendants' request in their Response brief that the Court either find that the Board's hearing was improper and weigh the merits underlying the decision or remand the matter to the Board for rehearing is essentially a request that the Court vacate the award. But, Defendants' request comes almost eleven months after they received the decision, well beyond the three-month statute of limitations.

Defendants apparently contend that the three-month statute of limitations does

12

not bar their claim because there is no evidence Walker or CAM Glass were served with the grievance, notice of hearing, or decision prior to the filing of this lawsuit. Indeed, Plaintiffs failed to present evidence that each document was actually sent by certified mail and accepted by Walker or a representative. Therefore, Defendants are correct that Plaintiffs failed to rebut Walker's assertion (via affidavit) that he did not receive any of the documents until November 2, 2006, two months after this suit was filed.

However, neither Walker nor CAM Glass filed a motion to vacate the Board's decision within three months of the date Walker acknowledges receipt of it. Defendants did not even assert the alleged invalidity of the decision as an affirmative defense in their Answer, which was filed after Walker received a copy of the award. In fact, Defendants did not assert any affirmative defenses. And, Defendants' only request that the Court vacate the award was made in its October 30, 2007 Response to Plaintiffs' Motion for Summary Judgment--11 months after Walker received a copy of the award. Assuming Defendants' Response is a proper means of making a motion to vacate an award, it is settled that "a party may not file defenses against confirmation after the time for an action to vacate has expired." *Occidental*, 853 F.2d at 1315.

To the extent Defendants would argue that the pendency of these proceedings tolled CAM Glass' obligation to file a motion to vacate the award, they failed to cite authority which supports such a claim. The Fourth Circuit rejected a similar argument in *Taylor v Nelson*, 788 F.2d 220 (4th Cir. 1986). In *Taylor*, defendant filed a contract-related action against plaintiff in the Western District of Virginia. While the Virginia action was pending, the parties participated in arbitration and an award was issued in favor of plaintiff. Plaintiff petitioned a New York state court to confirm the award.

13

Defendant opposed the New York action because the matter was still pending in Virginia. The state court agreed with defendant and granted his motion to dismiss the New York action. The next day, but 5 months after the Virginia award was issued, Defendant filed a motion in the Virginia district court to vacate it. Plaintiff filed motions to confirm the award and dismiss the underlying action.

The district court rejected plaintiff's assertion that defendant's motion was untimely, vacated the award on the grounds asserted by defendant (partiality), and denied plaintiff's motion for confirmation. The district court found that the pendency of the New York confirmation proceeding tolled the three-month statute of limitations, and that defendant acted with due diligence in filing the motion. Plaintiff appealed.

The Fourth Circuit reversed. The *Taylor* Court adopted a strict application of the three-month limitation and held that an attempt to vacate an arbitration award may not be made after the three-month period expires, even in opposition to a motion to confirm. The Court noted that "if a party opposing confirmation were always permitted to seek a vacatur in opposition to a petition to confirm, the three-month limit would have little practical effect." *Taylor*, 788 F.2d at 225 n.2.

The *Taylor* Court also questioned whether there is support for the district court's finding that defendant's untimely motion was excused by due diligence or tolling since no such exceptions are explicitly or implicitly provided for in the Federal Arbitration Act or common law. But, the Court found it unnecessary to decide the issue because it did not agree that defendant acted with "due diligence" by filing the motion immediately after the conclusion of the New York state court action, inasmuch as:

> During the pendency of the New York proceeding, . . . nothing

14

> prevented [defendant] from making a timely motion in the district court. Instead, [defendant] awaited the state court's jurisdictional ruling, a choice that caused him to wait longer than three months before he made a motion to vacate, and a decision that has proven fatal to his attempt to overturn the arbitration award. [Defendant] remained free at all times to pursue the statutory remedy . . . within the time limits set out by that statute, and he is not entitled to the benefit of any due diligence or tolling exceptions to the three-month rule, even if such exceptions exist.

*Id* at 225-226.  *See also International Brotherhood of Electrical Workers, Local Union No. 969 v Babcock & Wilcox*, 826 F.2d 962 (10th Cir. 1987)(defendant barred from asserting fact that it did not receive notice of the grievance hearing as a defense to plaintiff's petition to confirm the award, because defendant failed to file a motion to vacate the award within 90 days of receiving the grievance decision); *Ohio and Vicinity Regional Council of Carpenters v Higgins Contracting,* 2007 W.L. 912128, *4-5 (S.D. Ohio 2007)(defendant barred from asserting lack of notice of arbitration as defense to summary judgment because it failed to file a motion to vacate on that ground within 90 days).

Likewise here, nothing prevented CAM Glass from filing a motion to vacate the award during the three months after Walker received a copy of the decision.  CAM Glass elected not to do so.  As a result, CAM Glass' objections to the award are deemed waived; it is not at liberty to assert untimely claims regarding the validity of the Board's decision as a defense to Plaintiff's petition to confirm the award.

Even if Defendants properly and timely raised its opposition to the award, the Court does not have authority to vacate the award on the substantive grounds Defendants assert.  A district court's review of petitions to confirm grievance or arbitration awards is limited; it must enforce the award as long as the arbitrator was

15

"arguably construing or applying the contract," and did not commit fraud, have a conflict of interest, or otherwise act dishonestly. *Michigan Family Resources, Inc. v Service Employees International Union Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007)(en banc). "The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers International Union, AFL-CIO v Misco, Inc.*, 484 U.S. 29, 36 (1987). *See also Michigan Family*, 475 F.3d at 753 (Barring a failure to comply with the standard set forth, "the request for judicial intervention should be resisted even [if] the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute.").

The Board's decision on the amounts owed by CAM Glass was indisputably based upon its construction of the CBA. The Board accepted the unrefuted findings of the auditor (as summarized in a letter by Local 357's attorney) that CAM Glass did not contribute to the relevant funds between October 2002 and June 2005, and it determined that those findings established CAM Glass' violation of several provisions of the CBA. *See* Aff. of Michael Clem at Exh. I. Inasmuch as Defendants do not claim or prove that the Board's decision was the product of fraud, conflict of interest, or dishonesty, the Court is not at liberty to consider Defendants' contention that it is based on factual errors and/or a misinterpretation of CAM Glass' obligations under the CBA.

The Joint Trade Board award to Local 357 is confirmed.

## B.    CAM & Company is an Alter Ego of CAM Glass

The Court must next determine whether Plaintiffs established that CAM & Company is an alter ego of CAM Glass, such that CAM & Company is bound by the

Local 357 CBA and, therefore, is equally liable for the Joint Trade Board award and additional contributions Plaintiffs claim are owed for window installation work.

"The alter ego doctrine was developed to prevent employers from evading obligations under the Act merely by changing or altering their corporate form. The doctrine 'will be applied, when appropriate, to treat two nominally separate business entities as if they were a single continuous employer.'" *N.L.R.B. v Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986)(*quoting Alkire v NLRB.,* 716 F.2d 1014, 1018 (4th Cir.1983)). The doctrine "is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is 'merely a disguised continuance of the old employer.'" *N.L.R.B. v Fullerton Transfer & Storage Limited, Inc.*, 910 F.2d 331, 336 (6th Cir. 1990)(*quoting Southport Petroleum, Co. v N.L.R.B.*, 315 U.S. 100, 106 (1942)). "Increasingly, the term is also applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id.* A double-breasted operation typically arises when "a company operating with a unionized work force establishes a second, nonunionized company performing the same work in the same market under the same control." *Id* at 336 n.7. However, at least one district court within this circuit held that the alter ego doctrine can apply in the inverse situation--where the non-union company precedes a union company. *See Laborers Pension Trust Fund-Detroit Area and Vicinity v Interior Exterior Specialists Construction Group, Inc.*, 479 F.Supp.2d 674, 685 (E.D. Mich. 2007). *But cf. Cement Masons Pension Trust-Fund, Detroit & Vicinity v McCarthy*, 2006 W.L. 770444, *4 (E.D. Mich. 2006)(interpreting *Resilient Floors* as "categorically rejecting" application

17

of the alter ego doctrine when "a non-union company establishes a union company and no preexisting labor obligations are disrupted").

To determine whether the alter ego doctrine applies to either a "disguised continuance" or "double-breasted" operation, the Court must determine "'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Id* at 336 (*quoting Nelson Electric v N.L.R.B.*, 638 F.2d 965, 968 (6th Cir. 1981)). Additionally, an employer's intent to evade preexisting obligations" is a focus of the alter ego theory, but evidence of such intent is not a prerequisite to finding alter ego status. *Allcoast*, 780 F.2d at 581; *Fullerton*, 910 F.2d at 337; *Trustees of the Resilient Floor Decorators Insurance Fund v A& M Installations, Inc.*, 395 F.3d 244, 248 (6th Cir. 2005). Courts must "strike a balance among each criteria." *Allcoast*, 780 F.2d at 579. "No factor is controlling and all need not be present." *Yolton v El Paso Tennessee Pipeline Co.,* 435 F.3d 571, 587 (6th Cir. 2006)(citation omitted).

Plaintiffs presented evidence that CAM Glass and CAM & Company have substantially identical management, business, purpose, operation, customers, supervision, and ownership. With respect to management, supervision, ownership, business, and purpose it is undisputed that for both companies: 1) Walker was the owner and President, 2) his wife was the secretary and office manager, 3) Walker bid and supervised the jobs each company accepted, and 4) their primary business and purpose was performing subcontracts for window installation.

The evidence also supports Plaintiffs' assertion that both companies' operations were substantially identical. Both companies had the same address and telephone

number, the invoices submitted to HVG were identical, and, according to the auditor's unrefuted affidavit and documents, at least three installers (Chivington, Gierucki, and Steele) worked for both companies for some period of time.

Walker states in his affidavit that each business had its own records and bank accounts, and that they operated as separate businesses.  However, only the claim of separate bank accounts is supported with cognizable evidence, and there is evidence funds were commingled between those accounts on several occasions.  That is: 1) CAM & Company deposited $5,000 into CAM Glass account on two occasions in (April and May 2005), 2) at least a portion of the deposited funds were used by CAM Glass to cover the payroll costs of four installers (Chivington, Gierucki, Steele, and Wilson) on the Sashabaw project, and 3) when CAM Glass dissolved, the balance in its account ($3,400) was transferred into CAM & Company's account.

Walker says the CAM & Company deposits were only made so that CAM Glass could finish the Sashabaw project after HVG changed the project from non-union to union midstream, and that the balance transferred from CAM Glass to CAM & Company was merely a "capital investment."  However, Walker does not provide any evidence to support either claim, and "[u]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment."  *Galindo v Precision American Corp.,* 754 F.2d 1212, 1216 (5th Cir. 1985).  Moreover, even if Walker's statements alone are sufficient to raise a question of fact regarding why CAM Glass and CAM & Company funds were intermingled, the balance of evidence overwhelmingly establishes that CAM & Company and CAM Glass' operations were otherwise substantially identical.

19

Finally, CAM & Company and CAM Glass had one primary customer in common--HVG. HVG was CAM Glass' only client. Walker denies that HVG was also CAM & Company's only client between 2002 and 2005 as Plaintiffs claim. But, by Walker's own measure, HVG was a significant customer for CAM & Company. That is, Walker says, "[i]n a good year, CAM [&] Company will [only] have subcontracts about seven months of the year." Def. Exh. 2 at ¶5. However, records show that in 2004 alone CAM & Company billed HVG for at least 19 jobs on 9 different projects over 9 months. Pl. Exh. 6.

To the extent Defendants rely upon *Resilient Floors* for the proposition that the alter ego doctrine does not apply absent direct evidence of CAM & Company's intent to evade preexisting labor obligations, there is no merit to the claim. The Sixth Circuit's decision in *Allcoast Transfers* preceded *Resilient Floors*, and the Court explicitly held that "a finding of employer intent is not essential or prerequisite to imposition of alter ego status." 780 F.2d at 581. Moreover, although much of *Allcoast Transfers'* analysis was framed in terms of a typical "disguised continuance" operation because that was the situation before the Court, it spoke more broadly of the role intent should play in the balancing test. The Court explicitly required that district courts take a "flexible," fact-based approach which embraces the purpose of the alter ego doctrine--to prevent employers from avoiding labor obligations by merely changing or altering the corporate form:

> We note that the essential inquiry under an alter ego analysis is "[w]hether there was a *bona fide* discontinuance and a true change of ownership . . . or merely a disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942) . . . . This essential inquiry does

not require the Board to find that an employer intended to evade obligations under the Act in order to impose alter ego status. Instead, deciding whether a successor corporation is really the predecessor corporation by another name merely requires an examination of all the circumstances of each case, and a weighing of all the relevant factors. This conclusion is consistent with the cases discussing the alter ego doctrine since they generally recognize that the alter ego analysis should be flexible.

* * *

Our rejection of the argument that the Board must find an intent to evade union obligations or anti-union animus before imposing alter ego status furthers the purpose of the alter ego doctrine. As we stated earlier, the doctrine was developed to prevent employers from evading obligations under the Act by merely changing or altering their corporate form. If we were to require a finding of employer intent, an employer who desired to avoid union obligations might be tempted to circumvent the doctrine by altering the corporation's structure based on some legitimate business reason, retaining essentially the same business, and utilizing the change to escape the unwanted obligations. Our flexible approach will discourage such attempts at circumvention by allowing the Board to weigh all the relevant factors instead of requiring it to always show the employer's intent to evade. Accordingly, even when purportedly legitimate reasons support an alteration in structure, the Board can prevent an employer from avoiding obligations under the Act.

*Id* at 581-582 (internal citations omitted).

Similar to this case, in *Allcoast Transfers* the balance of the eight factors district courts must consider in an alter ego analysis heavily favored a finding of alter ego status because the two companies had substantially identical management, supervision, business, purpose, operations, equipment, and employees.  The Court stated that "[w]hen the circumstances so strongly support a finding of alter ego status, . . . the Board can properly weigh all of the factors and *infer* that the employer intended to evade union obligations."  *Id* at 583 (emphasis added).

Here, the undisputed and unrefuted evidence, even when viewed in a light most

favorable to Defendants, establish that CAM & Company and CAM Glass were substantially identical in all relevant respects; Defendants failed to show that there are genuine issues of material fact which support a contrary conclusion.  The Court finds that CAM & Company is an alter ego of CAM Glass.

**C.    CAM & Company is Liable for the Joint Trade Board Award and Additional Contributions**

As an alter ego to CAM Glass, CAM & Company is bound by the terms of the CBA CAM Glass entered into with Local 357 and is equally liable for CAM Glass' violation of its labor obligations under that agreement.  *Alkire v NLRB*, 716 F.2d 1014, 1018 (6th Cir. 1983).  Therefore, CAM & Company is liable for the Joint Trade Board Award in favor of Local 357 for CAM Glass' delinquent contributions between October 2002 and June 2005.

Plaintiffs also present evidence which supports a finding that CAM & Company owes additional contributions for window installation work it performed between May 2004 and June 2007 within the geographic area covered in the CBA.  Specifically, auditor Whatley reviewed a list of payments by CAM & Company to the four companies owned by Chivington, Steele, Gierucki, and Button between those dates, estimated the number of hours they worked, and multiplied the hours by the fringe benefit rate in effect at the time for each fund.  Whatley Second Aff. at ¶2.  Based on those calculations, Whatley estimates that CAM & Company owes contributions totaling $90,859.86 to all of the funds.  *Id* at ¶3; Exh. A.

Defendants dispute Whatley's calculations on several grounds:  1) Chivington, Steele, Gierucki, and Button were employed solely as subcontractors; 2) Gierucki and

Steele were members of the Laborers Union and benefits were paid to that union on their behalf; 3) Whatley's calculation includes amounts allegedly owed to a pension fund which is not a party to this litigation; and 4) Whatley's calculation includes work performed in Jackson County, Michigan, which is outside the geographical area covered by the CBA.  There is merit to Defendants' last two assertions; the first two fail on the merits.

First, Defendants imply that CAM & Company is not required to make fringe benefit contributions for work performed by subcontractors.  Plaintiffs dispute this claim and whether Chivington, Steele, Gierucki, and Button are even properly characterized as subcontractors, rather than employees.  It is not necessary, however, for the Court to resolve this dispute because the Local 357 CBA expressly required an employer to agree not to subcontract work covered by the agreement to an employer or employee who was not also bound by the contract:

> Section 18.14 Subcontracting.  The Employer agrees not to subcontract work to be done at the site of the construction, alteration or repair of a building, structure, or other work which would come under the terms of this Agreement to any Employer or Employee not having an Agreement with the Union, except as provided below:
>
> 1.    In the event the Employer elects to subcontract any work covered by this Agreement, the Employer shall:
>
>     a.    Provide in the subcontract for compliance by the subcontractor with the terms and conditions of this Agreement.
>
>     b.    Endeavor to make notice to the Union in advance.

Pl. Exhs. A, B.

In an action brought under Section 301 of the LMRA where an employer failed to

comply with a substantially similar provision in a CBA, the Tenth Circuit in *Trustees of Teamsters Construction Workers Local No. 13, Health and Welfare Trust Fund for Colorado v Hawg N Action, Inc.*, 651 F.2d 1384, 1386-1387 (10th Cir. 1981), held that the funds were "entitled to damages in a sum equal to that which they would have received if the agreement between the defendant and the union had been fully performed" as a remedy for the employer's breach of the agreement. The same rationale applies here.

Defendants' second argument is that Plaintiffs are inappropriately "double dipping" with respect to contributions allegedly owed for work performed by Gierucki and Steele because they were members of the Laborers Union and benefits were paid to that union on their behalf. Plaintiffs contend that CAM & Company's alleged payments to another union for work otherwise covered by the Local 357 CBA does not absolve CAM & Company from liability to Local 357.

There is support for Plaintiffs' assertion. In *Plasterers Local 67 v Niles Group*, 2007 W.L. 627869 (E.D. Mich. 2007), the employer assigned jobs covered by its CBA with the plaintiff funds to employees affiliated with other unions and paid fringe benefit contributions to those unions' funds. Defendant argued that the payments made to the other union absolved it of liability to plaintiff as a matter of law. The district court rejected defendant's argument.

The *Plasterers* Court pointed out that Section 515 of ERISA requires employers to make fringe benefit contributions in accordance with the terms of a CBA:

> Every employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms of
> a collectively bargained agreement shall, to the extent not

24

> inconsistent with law, make such contributions in accordance with
> the terms and conditions of such plan or such agreement.

29 U.S.C. §1145.  And, where the jobs at issue were within the territory covered by the

agreement and required fringe benefit contributions under the terms of the agreement,

the *Plasterers* Court held defendant was liable to plaintiff even if it resulted in double

payment to two different funds for the same work.

In an unpublished opinion, the Seventh Circuit in *Trustees of the Glaziers,*

*Architectural Metal and Glass Workers Local Union No. 27 Welfare and Pension Funds*

*v Gibson*, 99 Fed. Appx. 740 (7th Cir. 2004), applied the same reasoning.  The *Gibson*

Court held that if a CBA provides that contributions are due to a fund for certain jobs, an

employer "cannot avoid [its] obligations by assigning that work to nonunion members or

. . . members of a different union."  99 Fed. Appx. at 741.

It is not necessary, however, for the Court to decide whether to adopt the

reasoning of *Plasterers* and *Gibson* because Defendants failed to present evidence that

CAM & Company paid benefits to the Laborers Union for the hours at issue.  Walker

only vaguely says in his affidavit that "benefits were paid to the [L]aborers [U]nion" on

Gierucki and Steele's behalf, without any documents to support the claim or even

specifics as to the dates and amounts of the payments.

Notably also, Gierucki and Steele state in their respective affidavits that they

were only members of the Laborers Union for a brief period.  Gierucki acknowledges

working for CAM & Company from May 2004 through January 2007, but says he was

only a member of the Laborers Union for "a few months."  Def. Exh. 3, Gierucki Aff. at

¶¶2,5.  Steele, likewise, worked for CAM & Company from October 2004 through

October 2006 but says he was only a member of the Laborers Union while working on the Sashabaw job (which records show occurred in April and May 2005) through the end of the year. Def. Exh. 5, Steele Aff. at ¶¶1,4. Again, "[u]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo,* 754 F.2d at 1216.

Defendants' third assertion is that Whatley's calculation includes amounts owed to the Glaziers Pension Fund, which are not recoverable because the Glaziers Pension Fund is not a party to this suit. Plaintiffs do not dispute Defendants' claim. Therefore, the $31,927.68 Whatley determined is owed to the Glaziers Pension Fund should be deducted from the $90,859.86 total. *See* Whatley Second Aff., Exh. A.

Lastly, Defendants contend that Whatley's calculation should be further reduced because it includes contributions for work performed in Jackson County, which is outside the geographical scope of the CBA. Plaintiffs acknowledge that work performed in that area is outside the geographic scope of the CBA. But, in a Supplement to their Reply, Plaintiffs contend that the CBA should be construed to require Defendants to pay contributions even on work outside the geographic scope of the CBA. Alternately, Plaintiffs argue that Defendants failed to carry their burden to prove which jobs were not covered under the contract.

Plaintiffs failed to establish as a matter of law that the CBA requires Defendants to pay contributions for work performed outside the geographic scope of the contract. Plaintiffs point out that the CBA requires that an employer contribute the required amount for "each" or "all" hour(s) worked by a covered employee. Clem. Aff., Exh. A, Art. 6; Exh. B, Art. 6. According to James Vogelsberg, Chairman of the Labor

26

Negotiating Committee for the Glazing Contractors Association, Inc. ("the Association") which negotiates the collective bargaining agreements for Local 357, the broad language in Article 6 "[has] been understood by the Association to require those employers who perform work outside the geographic jurisdiction . . . to pay contributions on hours worked by employees that have been sent to work outside of that jurisdiction." Vogelsberg Aff. at ¶11.  Vogelsberg says that his own company pays contributions in accordance with this "understanding," and it was memorialized in Local 357's current CBA (effective June 1, 2007 through May 31, 2010).  *Id* at ¶¶3, 12; Exh. C, Art. 1, Sec. 1.2.

The contracts to which Defendants are bound set forth geographic boundaries and do not explicitly require an employer to pay contributions on work performed outside the jurisdiction.  Vogelsberg's claimed "understanding" that an employer's obligation, in fact, extends to work performed outside the jurisdiction is insufficient to bind Defendants absent evidence that the "understanding" was communicated with, shared, and/or assented to by Defendants.  Therefore, Defendants are not compelled to pay contributions on work which is proven to have been performed outside the geographic scope of the CBA.

It is a close question whether Defendants present sufficient evidence to raise a question of fact regarding whether and what amount should be deducted from Whatley's calculations for work performed in Jackson County.  As Plaintiffs point out, there is a paucity of evidence as to what work was performed outside the geographic area. Indeed, Defendants only present affidavits from Walker, Chivington, Steele, and Gierucki affirming that CAM & Company "Register QuickReports" attached to their

affidavits accurately reflect the location of work Chivington, Steele, Gierucki, and Button (as Lakeview Construction) performed for CAM & Company between May 2004 and January 2007 and the amounts they were paid.  *See* Def. Exhs. 2 - 5.  The QuickReports, however, are merely lists of dates, check numbers, and amounts.  *Id.* The city or county in which the work was allegedly performed is written in next to each entry with a designation by Defendants as to whether it was within or outside the scope of the CBA area.  Defendants do not attach the documents upon which the compiled lists are based.  With respect to additional work by Oneil Perrier and for Traverse City Glass, which Defendants claim was also performed outside the covered geographic area, the only evidence presented is Walker's assertions to that effect in his affidavits. *See* Def. Exh. 1 at ¶9; Exh. 2 at ¶8.

While the affidavits and lists combined are far from conclusive, they are some evidence that Whatley's figures are inaccurate.  Because the Court must construe the evidence in a light most favorable to Defendants, the Court finds there is a question of fact as to the amount which should be deducted for work performed outside the geographic scope of the CBA.

D. **Plaintiff Failed to Establish a Viable Claim for Walker's Alleged Misuse of the Corporate Form**

Citing *Laborers' Pension Trust Fund v Sidney Weinberger Homes, Inc.*, 872 F.2d 702 (6th Cir. 1988), Plaintiffs allege that Walker is personally liable for the amounts owed by CAM Glass and CAM & Company due to his "misuse of the corporate form" in order to "perpetrate a fraud on [P]laintiffs by holding himself out as a 'union' contractor while performing jobs and paying installers through a non-signatory company."  Pl. br. at p.

18. Plaintiffs, however, failed to establish, as a matter of law, that they are entitled to "pierce the corporate veil."

"A corporation is presumed to be a separate entity from its shareholders." *In re Michigan Carpenters Council Health and Welfare Fund v C.J. Rogers, Inc.,* 933 F.2d 376, 384 (6th Cir. 1991). But, the corporate shell may be disregarded if there are substantial reasons for doing so after weighing three primary factors:

> (1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators.

*Weinberger,* 872 F.2d at 704; *Fullerton,* 910 F.2d at 340. "In analyzing these three general factors, courts frequently consider more specific factors such as 'undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham.'" *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005). None of the factors is dispositive and each need not be met. *Weinberger*, 872 F.2d at 705. The *Fullerton* Court states:

> When fraud is shown, we do not believe that it is always necessary to show the other two factors. Similarly, if both injustice and little respect for the corporate entity are shown, we do not believe it is necessary to show fraud. Where extraordinary injustice is shown, it may alone be a sufficient predicate to liability.

*Fullerton,* 910 F.2d at 340.

In *Weinberger*, the Court found that many of the relevant factors were implicated

29

and piercing the veil was warranted because Weinberger completely disregarded corporate form and commingled corporate funds with his own:

> [I]t is clear that Weinberger "loaned" money to the corporation with no formal agreements, Weinberger paid expenses of the corporation out of his pocket, the corporation paid personal expenses of Weinberger, the corporation was operated solely for Weinberger's personal benefit, records of various expenses were generally inadequate, and Weinberger withdrew money from the corporate entity when the corporation ended while some creditors were left unpaid.

872 F.2d at 704. Plaintiffs do not allege commingling by Walker or disregard of the corporate form. Instead, they contend Walker formed CAM Glass to create the facade that he intended to be a union contractor in order to get HVG business. Plaintiffs assert Walker never intended to make fringe benefit contributions. However, the only evidence Plaintiffs point to of Walker's alleged intent is: 1) Walker invoiced union work through his non-union company; 2) CAM Glass reported installer income on 1099 forms instead of W-2 forms, and did not file dissolution papers until after this litigation was filed; and 3) CAM & Company transferred funds to CAM Glass on two occasions to cover payroll.

Under appropriate circumstances, evidence of fraud can be sufficient to justify piercing the corporate veil even if the other factors are not met. *Fullerton*, 910 F.2d at 340. However, none of the actions Plaintiffs cite establishes Walker's fraudulent intent as a matter of law, particularly since CAM Glass completed some union contracts and paid union benefits. Plaintiffs' motion for summary judgment on this claim is denied.

## V.     CONCLUSION

The Court:

A.     GRANTS Plaintiffs' motion on Count II and confirms the Joint Trade Board

award;

B.     GRANTS Plaintiffs' motion on Count I; CAM & Company is an alter ego of CAM Glass;

C.     GRANTS IN PART Plaintiffs' motion on Count III; CAM & Company and CAM Glass are liable for the Joint Trade Board award and for work performed under CAM & Company between May 2004 and January 2007 within the geographic scope of the CBA.  But, there is a question of fact regarding the amount which should be deducted for work performed outside the geographic area.

D.     DENIES Plaintiffs' motion (presumably on Count III) that Walker is also personally liable for contributions owed by CAM & Company and CAM Glass.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  February 22, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 22, 2008.

s/Linda Vertriest
Deputy Clerk